# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**CONNOLLY GEANEY ABLITT &**
**WILLARD, P.C.,**                          Chapter 7
    Debtor                              Case No. 14-14164

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEWART GROSSMAN, CHAPTER 7**
**TRUSTEE OF CONNOLLY**
**GEANEY ABLITT & WILLARD, P.C.,**
    Plaintiff
v.                                          Adv. Pro. 16-01163
**DURHAM COMMERCIAL CAPITAL**
**CORP. and MAASAI HOLDINGS, LLC**,
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Plaintiff's Motion for Summary Judgment pursuant to which Stewart F. Grossman, the Chapter 7 Trustee of the bankruptcy estate of Connolly Geaney Ablitt & Willard, P.C. (the "Debtor" or the "Law Firm"),[1] seeks summary judgment against the Defendant, Durham Commercial Capital Corp.

---

[1] On the involuntary petition, the petitioning creditors, who included Steven Ablitt, disclosed that the "Debtor" was also known as Ablitt Scofield, PC, Ablitt Law Offices, PC, and Ablitt & Charlton, PC. The Court shall refer to those entities as the "Debtor" and not limit the reference to Connolly Geaney Ablitt & Willard, P.C.

("Durham"), on Counts I and II of his Complaint to avoid $1,024,799.48 in transfers of cash and other property to Durham pursuant to 11 U.S.C. § 548 (Count I) and pursuant to 11 U.S.C. § 544(b) and Mass. Gen. Laws, ch. 109A, §§ 5 and 6 (Count II).  The Plaintiff also seeks summary judgment against Durham and Defendant, Maasai Holdings, LLC ("Maasai"),[2] on Count III of his Complaint to recover for the benefit of the estate the value of the avoided transfers pursuant to 11 U.S.C. § 550(a)(1).  Specifically, the Plaintiff seeks judgment against Durham as the "initial transferee" and against Maasai as "the entity for whose benefit such transfer[s] [were] made."[3]   The Plaintiff filed with his Motion a Concise Statement of Material Facts together with the Affidavit of Nicholas J. Negros, Esq. to which 20 exhibits were attached, including affidavits and reports of three expert witnesses concerning issues pertinent to key elements of the Plaintiff's claims under 11 U.S.C. §§ 548, 550 and Mass. Gen. L. Ch. 109A, including the amount of the transfers, insolvency, and the absence of reasonably equivalent value.

The Defendants filed an Opposition to the Motion to which they attached three exhibits and the Affidavit of Durham's president, Craig L. McGrain ("McGrain").  The Defendants did not file with their Opposition "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with

---

[2] Durham is a corporation organized under the laws of New York, with a principal place of business at 101 Sullys Trail, Building 20, Pittsford, New York.  Maasai is a limited liability company organized under the laws of New York, with the same principal place of business.  Both are under the common ownership and control of Craig L. McGrain.

[3] The Plaintiff set forth four counts in his Complaint, as noted above.  The Plaintiff did not seek summary judgment with respect to Count IV.

page references to affidavits, depositions and other documentation" as required by D.

Mass. LR 56.1, made applicable to this adversary proceeding by MLBR 7056-1.[4]   The

Defendants also did not file any expert reports to challenge the opinions of the Plaintiff's

experts.

## II. SUMMARY JUDGMENT RECORD

According to the court in <u>Brown v. Armstrong</u>, 957 F. Supp. 1293 (D. Mass.), *aff'd*,

129 F.3d 1252 (1st Cir. 1997),

Local Rule 56.1 was adopted to expedite the process of determining which
facts are genuinely in dispute, so that the court may turn quickly to the
usually more difficult task of determining whether the disputed issues are
material.  The rule accomplishes its objective by requiring that a summary

---

[4] D. Mass. LR 56.1, as it is set forth in MLBR, provides in pertinent part the following:

US District Court Local Rule. 56.1 MOTIONS FOR SUMMARY JUDGMENT

Motions for summary judgment shall include a concise statement of the
material facts of record as to which the moving party contends there is no
genuine issue to be tried, with page references to affidavits, depositions and
other documentation. Failure to include such a statement constitutes
grounds for denial of the motion. Opposition to motions for summary
judgment must be filed, unless the court orders otherwise, within 21 days
after the motion is served. A party opposing the motion shall include a
concise statement of the material facts of record as to which it is contended
that there exists a genuine issue to be tried, with page references to
affidavits, depositions and other documentation. Copies of all referenced
documentation shall be filed as exhibits to the motion or opposition.
Material facts of record set forth in the statement required to be served by
the moving party will be deemed for purposes of the motion to be admitted
by opposing parties unless controverted by the statement required to be
served by opposing parties. Unless the court orders otherwise, the moving
party may file a reply within 14 days after the response is served.

*Effective December 1, 2009.*

judgment motion "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried," with citation to the record, and that the opposition "include a concise statement of the material facts of record as to which it is contended there exists a genuine issue to be tried," also with citations to the record. D. Mass. Local R. 56.1. If the moving party complies with the Local Rule, any material facts of record set forth within their statement "will be deemed for purposes of the motion to be admitted ... unless controverted by the statement required to be served by opposing parties." Id. The non-movant's response must "state what *specific facts* are disputed and prevent summary judgment." Vasapolli v. Rostoff, 864 F.Supp. 215, 218 (D. Mass. 1993), *aff'd*, 39 F.3d 27 (1st Cir. 1994) (emphasis added).

Brown, 957 F. Supp. at 1297. *See also* Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) ("[F]ailure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.").

In Brown, the defendants moved for summary judgment and to strike the plaintiff's statement of facts.  The district court, noting that the plaintiff's fact statement failed to comply with the applicable local rule, observed that the statement "generates a lot of dust, . . . [but] it does not further the goal of sharply focusing areas of dispute." Brown, 957 F. Supp. at 1297 (citing Key Trust Co. of Maine v. Doherty, Wallace, Pillsbury & Murphy, P.C., 811 F.Supp. 733, 734 n. 2 (D. Mass. 1993)).  Rather than granting the defendants' motion to strike, however, the court imposed the sanction provided for in the rule itself, namely deeming all facts set forth in the defendants' fact statement to be admitted, at least where defendants provide a citation to the record which supports the assertion of fact in question.  Brown, 957 F.Supp. at 1298.

4

This Court conducted a hearing on the Trustee's Motion for Summary Judgment on January 9, 2019.  At the hearing, the following colloquy took place:

> THE COURT: So you -- you didn't submit a concise statement of material facts, correct?
> MR. HARRINGTON: Yes, Your Honor. We believe that we submitted a statement of facts and we contested the Trustee's facts in our arguments and these are -- we don't think the facts are particularly contested or disputed. We think the Trustee's expert reports and their analysis of those facts are mistaken, but we don't dispute that the transfers were made.  We don't dispute that the loan was purchased. We don't dispute that the debtor went bankrupt. We -- I think both parties agree essentially to the fundamental facts. We just think that there's a question of characterization of those facts.

Notwithstanding the Defendants' attorney's statement that the Defendants did not particularly dispute the material facts, the Defendants in their Opposition argue otherwise.  In their Opposition, the Defendants raised factual issues regarding reasonably equivalent value and insolvency, but they did not offer a statement of disputed facts or experts opinions in support of those factual issues.

In view of the foregoing representations made by Defendants' counsel, the Defendants' failure to submit a statement of disputed material facts, and the Court's review of the submissions of the parties, the Court determines that the Defendants failed to comply with D. Mass. LR 56.1.  Accordingly, the Court deems the material facts set forth in the Plaintiff's statement of facts to be admitted.  *See* Amoah v. McKinney, No. 4:14-40181-TSH, 2016 WL 6134119, at *2 (D. Mass. Sept. 2, 2016), *aff'd*, 875 F.3d 60 (1st Cir. 2017).[5]

---

[5] In Amoah, the court observed:

## III. FACTS

As noted above, the Plaintiff seeks summary judgment against Durham with respect to Counts I and II to avoid $1,024,799.48 in transfers that occurred during the period between January 14, 2013 and February 7, 2013, and against both Durham, as the initial transferee, and Maasai, as the entity for whose benefit such transfers were made, with respect to Count III to recover for the benefit of the estate the value of the avoided transfers.  As a result of Defendants' counsel's concession that the Defendants did not comply with D. Mass. LR 56.1., the Court now makes the following findings of fact, paraphrasing and supplementing the Concise Statement of Facts submitted by the Plaintiff.

As of October 2012, and continuing through at least February 2013, the Debtor was organized under the laws of Rhode Island and registered as a foreign corporation in Massachusetts.  It operated as a Massachusetts law firm under the name "Ablitt Scofield,

---

Courts vary somewhat as to whether, in the event of the non-movant's noncompliance, the movant's facts must be, or merely may be, deemed as admitted. Compare <u>Northern</u>, 598 F. Supp. 2d at 171 ("Any material facts set forth by the moving party that are not 'controverted' by the non-movants' statement *must* be 'deemed for purposes of the motion to be admitted.'") (quoting L.R. 56.1) (emphasis added) *with* <u>Butters v. Wells Fargo Advisors</u>, LLC, No. 10 Civ. 10072, 2012 WL 5959986, at *2 (D. Mass. Nov. 27, 2012) ("Where a party opposing a motion for summary judgment fails to comply with Local Rule 56.1, the court has the discretion to decide whether to impose the sanction of deeming the moving party's factual assertions to be admitted.") (citing cases). *The Local Rule's statement, however, that non-controverted material facts "will be deemed for purposes of the motion to be admitted" (emphasis added), supports the more stringent view.*

<u>Amoah v. McKinney</u>, 2016 WL 6134119, at *2 (emphasis supplied).

P.C." (f/k/a "Ablitt & Charlton, A Professional Corporation") at 304 Cambridge Road, Woburn, MA 01801 ("Property"). The Debtor's two principals were Steven Ablitt ("Ablitt") and Lawrence Scofield ("Scofield"). The Property was owned by SAA Group, LLC ("SAA") which, in turn, was owned in whole or substantially in part by Ablitt.

The Debtor's primary business was high-volume consumer home mortgage loan enforcement on behalf of national loan servicers and financial institutions, including, by way of example, Ocwen Loan Servicing, LLC, Select Portfolio Servicing, Inc. ("SPS"), and Bank of America, N.A. ("BofA").

On September 3, 2014, Summit Title Corporation, Petite Etoile Corporation, Pioneer Title and Abstract LLC, and Ablitt filed an involuntary Chapter 7 petition against the Debtor.  On October 16, 2014, the Court entered an order for relief under Chapter 7.

A. The Debtor's Financial Problems

As of October 2012, and continuing until at least February 2013, the Debtor was burdened by substantial indebtedness.  In or around October 2012, DCR Mortgage IV Sub III, LLC ("DCR") held, by assignment from Sovereign Bank, three distinct loan obligations relating to the Debtor and/or SAA. Sovereign Bank assigned the loan obligations to DCR Mortgage IV Sub I, LLC, which in turn assigned them to DCR. These loan obligations are set forth in detail in an Amended and Restated Forbearance Agreement, dated February 7, 2013, which was executed by DCR, SAA, the Debtor, and Ablitt ("DCR Forbearance Agreement").  The loan obligations are summarized as follows:

| Obligation | Primary Obligor | Guarantors | Original Stated Principal Amount | Outstanding Principal Balance | Accrued and Unpaid Interest |
|---|---|---|---|---|---|
| Dec. 21, 2007 Term Note | SAA | Ablitt, Debtor | $4,000,000.00 | $3,711,119.14 | $100,452.10 |
| Aug. 13, 2008 Note | SAA | Ablitt, Debtor | $ 560,000.00 | $ 276,532.01 | $ 8,741.10 |
| Dec. 21, 2007 Revolver [sic] Credit Facility | Debtor | Ablitt, SAA | $1,500,000.00 | $1,448,819.94 | $ 44,792.67 |

The two SAA loans (the "SAA Obligations") were secured by senior mortgages on the Property. The Debtor's $1.5 million revolver facility was secured by a first lien on the Debtor's accounts receivable. (App Ex. 4, Recital C(ii))  As a result of cross-guaranties and cross-collateralization agreements, the Debtor's guaranty of the SAA loans also secured the Debtor's present and future accounts receivable. (App Ex. 4, Recitals C - I)  As of October 2012, the various loan obligations were all in default, and the Debtor was operating under the terms of an Amended and Restated Forbearance Agreement dated July 1, 2012. (App Ex. 4, Recital L)

B. ServiceLink Obligation

In the fall of 2012, the Debtor also was in default with respect to its payment obligations to one of its vendors, Lender Processing Services, LLC ("LPS"). (App Ex. 5) Pursuant to a settlement agreement with LPS, the Debtor executed a promissory note, dated October 15, 2012, in favor of LPS (the "LPS Note") in the amount of $4,148,027.00, evidencing its settled indebtedness to LPS. (App Ex. 5, p. 6)  The LPS Note called for monthly payments of principal and interest pursuant to an amortization schedule

attached to the LPS Note. (App Ex. 5, p. 14)  On October 15, 2012, the Debtor executed a Security Agreement granting LPS a security interest in all of its assets, including accounts receivable, to secure the obligations under the LPS Note (the "LPS Security Interest"). (App Ex. 5, p. 17-24, Terms ¶ 2) The LPS security interest was perfected by the filing of a UCC-1 financing statement on November 1, 2012. Because of name changes and one or more corporate acquisitions, the LPS Note, Financing Statement and concomitant security interest were assigned to ServiceLink NLS, LLC ("ServiceLink"). (App Ex. 5, p. 26-33) ServiceLink's security interest was junior to DCR's security interest. (App Ex. 5)

C. <u>Debtor's Plan to Access Capital</u>

On November 7, 2012, the Debtor and Durham entered into a "Nonrecourse Receivables Purchase Contract and Security Agreement" (the "Factoring Agreement"). (App. Ex. 6). The Factoring Agreement set forth the terms under which Durham would purchase accounts receivable from the Debtor. The Factoring Agreement provided for the payment of an "origination fee" of 1% of the "Credit Limit" (defined as $1,200,000) upon signing and at each anniversary. (<u>Id.</u>, §4.6.2) The Factoring Agreement also provided for the payment of a fee of 3.25% of the original face amount of each account receivable purchased by Durham, plus, commencing on the 30th day following the date of purchase, 1.625% of the face amount of invoices for each 15-day period that Durham had not received payment of the face amount of the invoices. (<u>Id.</u>, §4.6.1) The Factoring Agreement further provided that Durham would reserve, and withhold in a "reserve account," 35% of the face amount of each purchased account, which reserve account could be applied by Durham against any obligations of the Debtor to Durham, and held

9

pending payment of the accounts.[6] (Id., §4.8) Durham retained sole discretion to determine which accounts it wished to purchase from those offered by the Debtor. (Id., §2.2) Durham further agreed that it would advance the purchase price to the Debtor (less any specified reserve) *on the date that the account was accepted and purchased by Durham.* (Id., §4.7) (emphasis added).

In addition, as part of the Factoring Agreement, the Debtor granted Durham, "as collateral for repayment of any and all obligations and liabilities whatsoever of Client [the Debtor] to Durham" a security interest in the Debtor's right, title and interest in and to "[a]ll Accounts (including Accounts purchased by Durham hereunder and repurchased by Client [the Debtor], promissory notes, chattel paper, general intangibles . . ., and all rights of Client as seller of goods . . .," as well as inventory, equipment and fixtures, books, records, computer related programs and data, investment property and "[a]ll proceeds of the foregoing . . . ." (Id., §4.1-4.2.6)  Durham properly perfected its

---

[6] The Factoring Agreement provided in pertinent part:

> . . . The reserve account may be held by Durham and applied against any obligations of Client or any Affiliate of Client to Durham, known or anticipated, and the reserve account shall not be due and payable to Client until any and all obligations of Client to Durham are fully paid and/or satisfied.  Notwithstanding the foregoing, as each Account is paid in full, the reserve associated with the paid Account will be paid to Client provided, however, there does not then exist an event or condition of default and further provided, however, that in no event at any time shall the aggregate balance in the reserve account be less than thirty five percent (35%) of Client's then unpaid Acceptable Accounts purchased by Durham.

Id. § 4.8

security interests.   The Law Firm's obligations under the Factoring Agreement were nonrecourse.[7]

As ultimately documented by instruments dated as of February 7, 2013, the parties agreed that DCR would sell the fully secured $1.5 million line of credit note (the "DCR Note") to Durham or an affiliate for $700,000.00.  Further, the parties agreed that various obligations of SAA to DCR arising from the mortgage notes, including payment of real estate taxes, would be brought current and that DCR would release the Debtor's collateral from the Debtor's guaranty of the remaining SAA note obligations. Thereafter, the parties set about documenting the transactions. (App. Exs. 4, 10, 11, 12, 18)

D. <u>The Property Transfers</u>

1. Account Debtors Pay Durham $198,100.33 on Account of Unfactored Invoices

On or about December 21, 2012, prior to the acquisition of the DCR Note by Maasai on February 7, 2013, Durham, together with the Law Firm, sent a letter to a client of the Debtor's predecessor, SPS, indicating that accounts had been assigned to Durham, that the accounts were to be "processed" by Durham, and that thereafter all payments should

---

[7] According to the Defendants, "[u]nder the Factoring Agreement, sums were thereafter disbursed to the Law Firm. For example, Durham advanced: $1,215,185.47 to the Law Firm in February 2013; $659,543.18 in March 2013; $877,217.30 in April 2013; and $1,057,003.11 in May 2013. These advances continued through June of 2014."  Durham also asserted that "Durham was supposed to receive repayment of those funds directly from the Debtor's clients. The Debtor, however, directed its clients to pay over $3,550,000 directly to the Debtor rather than to Durham. The Debtor's directions were in direct violation of the Factoring Agreement, UCC §9-406 and the notices sent to Debtors [sic] clients."

be made to Durham. The letter, which was on Durham letterhead and signed by

Stephanie S. Ernest on behalf of Durham and the Law Firm, provided in pertinent part:

> I am pleased to inform you that Ablitt│Scofield, PC has attained [sic] Durham Commercial Capital Corp (Durham) as a source of capital and accounts receivable processing.  This will enable Ablitt│Scofield, PC to accommodate the growth and development of their [sic] business while maintaining a high level of customer service.
>
> As part of the program the accounts receivable of Ablitt│Scofield, PC have been assigned to Durham and are processed through Durham.
>
> Therefore payments for invoices should be made payable to Durham . . .

(App Ex. 7; App Ex. 3 at p. 72, lines 7-18)  A similar notice was sent to BofA at about the

same time. (App Ex. 3, pp. 72-73) As of December 21, 2012, Durham had not purchased

any of the SPS or BofA accounts or advanced any funds to the Debtor under the Factoring

Agreement.

Between January 14, 2013 and February 4, 2013, Durham collected from SPS and

BofA receivables totaling $198,100.33 ("Unfactored Invoices"). (App Ex. 8, p. 5) Durham

did not then or at any time thereafter purchase any of the Unfactored Invoices and did

not advance any funds to the Debtor as consideration for the Unfactored Invoices.

Durham did not remit any of the collections to the Debtor.

Penelope Bley ("Bley"), a forensic analyst employed by Verdolino & Lowey, P.C.,

with over 40 years of experience in general accounting and bookkeeping and over 18

years of experience in forensic accounting, prepared a report "extracted from the Durham

Accounting titled 'Unfactored Invoices Collected by Durham'" ("Unfactored Collections

Report").[8] According to Bley,

> The Unfactored Collections Report shows that between January 14 and
> February 4, 2013, Durham reported collecting $198,100.33 on account of the
> Debtor's invoices ("Unfactored Invoices"). No invoices were factored prior
> to February 7, 2013. Yet, Durham started collecting invoices before any
> invoices were actually sold to Durham and before Durham made any cash
> advances to the Debtor. In its answers to interrogatories, Durham has never
> contended that any of the Unfactored Invoices were ever sold to Durham.
> Durham has never produced any evidence that it purchased such invoices,
> such as, an Account Purchase Addendum, which was a form Durham used
> to document the purchase and sale of specific invoices. Based on my review
> of the accounting records, Durham never remitted any of the $198,100.33 to
> the Debtor.

    2. The Debtor Transfers $200,000 Cash to Durham

On February 7, 2013, the Debtor transferred by wire $200,000.00 in cash to

Durham. (App Ex. 8, p. 6; App Ex. 9; App Ex. 3, p. 64, lines 12-15) The cash came from the

Debtor's collection of an invoice in the amount of $439,750.00 previously issued to

JPMorgan Chase ("Chase") on account of legal services provided to Chase. (Id.) The

---

[8] She explained the process and methodology she employed to prepare the Unfactored
Collections Report:

> In or around August 2015, I received a flash drive from Trustee's counsel,
> which I understand was provided by Durham's and Maasai's counsel
> under cover of letter dated August 7, 2015. According to the cover letter and
> confirmed by Durham and Maasai, the flash drive contains a complete
> accounting of all advances and collections by Durham relating to the
> Factoring Agreement. The flash drive file contained thousands of lines of
> data. After receiving the flash drive, I converted the file to an Excel file from
> which I was able to produce multiple reports and conduct multiple analyses
> of the data. I was also able to compare the data with the Debtor's
> QuickBooks files and bank account statements so as to reconcile Durham's
> accounting with the Debtor's own accounting records.

Chase Invoice had not been sold to Durham, nor did Durham at any time return the $200,000.00 to the Debtor. (Id.)[9]

3. The February 7, 2013 Transactions

On February 7, 2013, DCR sold the DCR Note to Durham's affiliate, Maasai, in consideration for payment of $700,000.00. (App Ex. 10, Section 2(b)) On the same day, SAA, the Law Firm, Ablitt, and DCR executed an Amended and Restated Forbearance Agreement. (App Ex. 4) The Amended and Restated Forbearance Agreement contained the following recitals:

> M. Ablitt Scofield, SAA and Individual Guarantor have requested that Lender enter into the Loan Sale Contract and, effective upon the consummation of the transaction contemplated thereby (the "Loan Sale Effective Time"), agree to forbear against SAA and Individual Guarantor

---

[9] Bley stated the following:

> On February 7, 2013, the Debtor transferred $200,000 in cash to Durham. The transfer is confirmed by or through multiple sources, including emails, invoice records, and bank statements. On January 17, 2013, the Debtor invoiced its client JPMorgan Chase $439,750.00. Accounting records and emails that were attached to the Trustee's opposition to Maasai's motion for summary judgment show that on February 6, 2013, the Debtor received a payment of the invoice from JPMorgan in the amount of $439,750.00. The following day, the Debtor made an outgoing wire transfer of $200,000. On the same day, the Debtor forwarded the wire confirmation to Craig McGrain, thus confirming that it had wired $200,000 to Durham's bank account, Account No. ending 7368. In its answers to interrogatories, Durham admits having received the $200,000 cash transfer.

> Thus, as of February 7, 2013, Durham was in possession of $398,100.33 of the Debtor's money, $198,100.33 representing collections of Unfactored Invoices, and $200,000 cash (representing $200,000 of the $439,750 the Debtor had just collected from its client JPMorgan Chase). Further, as of such date, no consideration of any kind or nature whatsoever had been provided to the Debtor in exchange for such funds.

under the Loan Documents which have not been sold to MHL [Maasai] (together with the Deficiency Note, the Amended and Restated Notes and the Third Mortgage (as each such term is defined below), and any other agreement, instrument or other document with or in favor of Lender to which SAA and/or Ablitt Scofield is a party or maker executed in connection herewith, the "Remaining Loan Documents"), for a period of time as specified herein, and on the terms and conditions set forth herein.

N. Ablitt Scofield, SAA and Individual Guarantor also have requested that Lender, among other things, (a) liquidate and compromise SAA's obligations under the SAA Guaranty and convert such liquidated and compromised obligations to a promissory note made by SAA to Lender in the original principal amount of $250,000 in the form attached hereto as Exhibit C (the "Deficiency Note"; together with the Amended and Restated Notes, the "Remaining Notes"), to be secured by a mortgage on the Property (as amended and modified, the "Third Mortgage"), (b) eliminate the cross-collateralization provisions between the Loans in respect of which SAA is the primary obligor and the Loans in respect of which Ablitt Scofield is the primary obligor, (c) specifically limit the obligations of Ablitt Scofield under the AB Guaranty and convert it to an unsecured guaranty, (d) amend and restate the 2007 SAA Note and the 2008 SAA Note pursuant to the Amended and Restated Notes, and (e) terminate or cancel documents relating to certain obligations of Ablitt Scofield to Lender.

(App. Ex. 4)

In summary, the Amended and Restated Forbearance Agreement provided, among other things, for the release of the Debtor's accounts as security for the Debtor's guaranty of SAA's obligations,[10] and expressly reaffirmed the Debtor's guaranty. (Id., ¶¶ 10, 22)[11]

---

[10] Section 12 of the Amended and Restated Forbearance Agreement provided:

> Termination of Agreements, Etc. The Cross Collateral Agreements, the 2009 AB Loan Agreement and the 2009 Individual Guarantor Guaranty (as each such term is defined in Exhibit B) are hereby terminated.

[11] Paragraph 10 of the Amended and Restated Forbearance Agreement provided:

On the same day that the Debtor executed the Amended and Restated Forbearance Agreement (neither Defendant was a party to that agreement), Maasai, the Law Firm, and Ablitt executed a two-year Forbearance Agreement.  (App Ex. 11)  While acknowledging that the Loan was in default, that Maasai was entitled to exercise all of its rights and remedies under the Loan Documents, and that Maasai's agreement to forbear from enforcing its rights and remedies was not a waiver of those rights, the Forbearance Agreement provided:

> From the Effective Date until the date that is the earlier of (i) December 31, 2014, or (ii) the date that Lender sends written notice to Borrower Parties pursuant to Section 17, or (iii) the occurrence of an Event of Forbearance Termination (as defined in Section 17) of the type set forth in Section 17(b) (the "Forbearance Period"), Lender agrees not to foreclose or attempt to foreclose upon any Collateral, institute suit against Borrower for collection of the Note, institute suit against Guarantor pursuant to the Guaranty, and/or exercise any other remedies available to it under the Loan Documents and/or under applicable law. . .

<div align="center">***</div>

> Converting AB Guaranty to Unsecured Guaranty: No Cross-Collateralization.  Notwithstanding anything to the contrary contained in the Loan Documents, (a) all obligations of Ablitt Scofield to Lender, including without limitation, under this Agreement and the Remaining Loan Documents (including, without limitation, the AB Guaranty), shall be unsecured . . . ."

Paragraph 22 of the Amended and Restated Forbearance Agreement provides:

> AB Guaranty.  Ablitt Scofield hereby consents to the terms, conditions and provisions of this Agreement and the transactions contemplated by it. Ablitt Scofield hereby reaffirms the full force and effectiveness of the AB Guaranty and acknowledges that the AB Guaranty continues to guaranty all SAA Obligations (including, without limitation, the obligations of SAA under the Deficiency Note and the Amended and Restated Notes), and that Ablitt Scofield's obligations under the AB Guaranty are separate and distinct from those of SAA.

<div align="center">16</div>

> Notwithstanding anything to the contrary contained in the Note, during the Forbearance Period, (i) the Note will bear interest at a fixed rate of seven percent (7.00%)) per annum computed on the principal balance thereof from time to time outstanding, and (ii) Borrower shall not be required to pay to Lender any amounts due under the Note. Lender reserves the right to impose the "Default Rate" (as defined in the Note} at any time after the occurrence of an Event of Forbearance Termination and Borrower Parties hereby agree thereto.

(Exhibit 11, ¶¶ 3(a), 9) The agreement also contained confirmation that the former cross-collateral agreements among SAA, the Debtor, Ablitt, and DCR were terminated.

### 4. Sale of Invoices to Durham Having a Face Value of $951,719.81

On February 7, 2013, the Debtor sold to Durham hundreds of accounts with an aggregate face value of $951,719.81 (collectively, the "Factored Invoices").  The sale of the Factored Invoices was documented by multiple Account Purchase Addenda. The Account Purchase Addenda were prepared by Durham for signature by Scofield on behalf of the Debtor. Each Account Purchase Addendum provided that "[i]n consideration of the total purchase price set forth below, Seller hereby sells and assigns to Purchaser the following described accounts receivable due from" followed by a series of columns with the following headings:  Account Debtor, Store, Invoice Number, Invoice Date, Invoice Amount, Reserve Amount "Trans Fee," and Advance Amount.  According to Durham's calculations, the aggregate amount advanced to the Debtor for the accounts the Debtor sold to it was $626,699.15. (App Ex. 8, p. 6; App Ex. 12, Trustee_00001)

### 5. Durham's Actual Use of Funds Provided by Debtor to Durham

Durham did not in fact advance $626,699.15 on the date of purchase, i.e., February 7, 2013, nor did Durham ever advance such funds to the Debtor at any time thereafter in

17

exchange for the Factored Invoices. (App Ex. 8, p. 6)  Bley was asked to examine whether

"the $626,699.15 that Durham reported as 'Advanced' on February 7, 2013 [was] ever

advanced to the Debtor - whether on February 7, 2013 or thereafter."

Bley stated the following in her report:

> At no time did the Debtor ever actually receive from Durham any of the $626,699.15 that was purportedly advanced. The Durham Accounting shows all of the advances made by Durham to the Debtor after February 7, 2013. I have reconciled all the advances against the Debtor's QuickBooks files to verify that the advances shown in the Durham Accounting (other than the $626,699.15) were in fact advanced to the Debtor. Significantly, the Durham Accounting links every advance to a specific invoice such that each advance made to the Debtor after February 7, 2013 was in exchange for one or more invoices sold and assigned to Durham under the Factoring Agreement. From this fact it follows and it is my opinion that none of the $626,699.15 was ever subsequently advanced to the Debtor. As explained below, however, Durham did in fact rebate a portion of what it collected on account of the February 7, 2013 Factored Invoices.

> I analyzed the ultimate disposition of the February 7, 2013 Factored Invoices based on the Durham Accounting, extracting such invoices from the Excel created directly from the Durham Accounting. The report ("Factored Invoice Detail") was attached to the Trustee's Opposition to Maasai's Motion for Summary Judgment as its Exhibit H. The last page of Exhibit H shows the "Grand Totals" using Durham's accounting terminology as follows:

| Invoice Amount | Factored Amount | Collected | Advanced | Over (short) Pay | Rebate | Fee |
|---|---|---|---|---|---|---|
| $951,719.81 | $880,938.40 | $894,403.88 | $626,699.15 | ($57,315.93) | $235,366.46 | $32,338,339.27 |

> The term "rebate" is Durham's terminology for the portion of a factored receivable over and above the advance that is subsequently paid to the invoice seller after the receivable has been successfully collected. Thus, the Durham Accounting shows that of the invoices assigned to Durham on February 7, 2013, Durham collected $894,403.88. Since Durham never actually transferred the amount shown as having been "advanced", the only amount that the Debtor ever received for such invoices was $235,366.46.

18

The Account Purchase Addenda prepared by Durham was part of an attachment to an e-mail ("E-mail Attachment") from Durham's employee, Tim Mura, to Robert Feige, the Chief Operating Officer of the Law Firm, with a copy to McGrain. (App Ex. 12, Trustee_00001) The February 7, 2013 email contained a request that Scofield execute the "attached funding documents," and that "[u]pon receipt of these and the final closing documents we will wire the funds to DCR to purchase the loan." Id. The final page of the February 7, 2013 Email Attachment identifies the $198,100.33 and $200,000 as "Total Rebates Due" of $398,100.33, identifies as "Other Charges" in the sum of $1,024,799.48, identifies "Cash Reserves" of $0.00, and identifies a "Net Check" of ($626,699.15). The Rebate Statement contains the following breakdown of the Other Charges:

| Date | Description | Amount |
|------|-------------|--------|
| 2/7/2013 | Purchase DCR Note | $ 700,000.00 |
| 2/7/2013 | DCR Tax/Utilities | $ 161,712.46 |
| 2/7/2013 | Holland & Knight Legal | $ 59,514.17 |
| 2/7/2013 | DCR Misc Fees | $ 42,713.19 |
| 2/7/2013 | Bond Schoeneck Legal | $ 40,455.19 |
| 2/7/2013 | Factoring Origination Fee | $ 12,000.00 |
| 2/7/2013 | Factoring Fee | $ 6,000.00 |
| 2/7/2013 | Verification Fee | $ 2,354.47 |
| 2/7/2013 | Wire Transfer Fee to DCR | $ 25.00 |
| 2/7/2013 | Wire Transfer Fee to Holland Knight | $ 25.00 |
| Total | | $1,024,799.48 |

On February 7, 2013, Durham transferred $963,989.82 to Maasai by "teller transfer." (App Ex. 3, p. 107) On that day, and on February 8, 2013, Maasai wired $963,964.82 to DCR and DCR's counsel, Holland & Knight. (App Ex. 13) The wired amount equaled the amount required to purchase the DCR Note, including the stated purchase price of $700,000, the tax and utilities owed by SAA of $161,712.46, legal fees

owed to Holland & Knight in the amount of $59,514.17, DCR "miscellaneous fees" of

$42,713.19, and a wire transfer fee of $25.00.  The factoring origination fee ($12,000.00),

the factoring fee ($6,000.00), the verification fee ($2,354.47), the legal fees of Bond

Schoeneck ($40,455.19), and a $25 wire transfer fee were not included.  Each of those

amounts were exactly as stated in the final page of the Email Attachment reproduced

above. (App Ex. 12, Trustee_00068)  On February 7, 2013, DCR sold, and assigned by

Allonge, the DCR Note to Maasai. (App Ex. 10)

6. Disposition of Durham's Collections from the Factored Invoices

After February 7, 2013, and continuing for a period of approximately a year, the

Debtor factored accounts to Durham. The $626,699.15 which Durham characterized as

"Advanced" on February 7, 2013 was never advanced to the Debtor during their entire

relationship as stated by Bley in her expert report.  As of February 7, 2013, Durham had

not advanced any funds to the Debtor.  Every advance that Durham made to the Debtor

after February 7, 2013 was made in exchange for one or more invoices sold and assigned

to Durham under the Factoring Agreement. (App Ex. 8, p. 6) Bley stated she "reconciled

all the advances against the Debtor's QuickBooks files to verify that the advances shown

in the Durham Accounting (other than the $626,699.15) were in fact advanced to the

Debtor."

During the several months following February 7, 2013, Durham collected

$894,403.88 on account of the Factored Invoices, and rebated or remitted to the Debtor

$235,366.46. (App Ex. 8, pp. 6-7; App Ex. 14) Durham's accounting records show that the

only amount Durham paid to the Debtor in exchange for the sale to Durham of the

Factored Invoices was $235,366.46. In addition to the $626,699.15 that was never advanced, Durham retained $32,338.27 in fees. The remaining balance of $57,315.93 was uncollected. (Id.) In sum, of the $951,719.81 in invoices that were sold to Durham on February 7, 2013, Durham collected and retained for itself $659,037.42 ($951,719.81 face amount, less $57,315.93 uncollected and less $235,366.46 rebated to the Debtor). (Id.)

### 7. Summary of Transfers

The total value of the transfers made by the Debtor to Durham on and before February 7, 2013 (net of the $235,366.46 rebate and $32,338.27 in fees) is at least $1,024,799.48. (App Ex. 8, p. 7) If the proceeds from the collection of the Factored Invoices which Durham retained as "Fees" in the amount of $32,338.27 is included, then the total value of the transfers on or before February 7, 2013 is $1,057,137.75. (Id.) Thus, the "Transfers" for purposes of the the Plaintiff's Complaint are 1) the combined $198,100.33 in collections of the Unfactored Invoices between January 14 and February 4, 2013; 2) the $200,000 in cash wired to Durham on February 7, 2013; and 3) the Factored Invoices that were sold, assigned, and transferred to Durham on February 7, 2013.

### E. Consideration Received by Debtor In Exchange for Transfers

### 1. Nature of Consideration

The benefit to the Debtor identified by Durham in making the Transfers, and in engaging in the February 7, 2013 transactions, was, according to McGrain, to gain access to working capital through receivables factoring financing "so that they can not only continue to operate but to expand." (App Ex. 3, p. 135, lines 6-9; App Ex. 15, p. 6 (Answer to Interrogatory No. 8))  According to McGrain at his deposition:

See, you have to understand, they couldn't – they didn't have any money. They didn't have any ability to get any money. Right? Because you've got a $4.5 million real estate loan, which is collateralized against the law firm. You also have a $1.5 million loan, which is collateralized against the assets of the law firm.

So, as the law firm goes out and tries to borrow any money from a bank or a finance company or anything, right, you have these – you have $6 million in first liens against those trading assets of the company.

So if you're going to loan any money to the company or get any cash into the company whatsoever, you've got to remove those, right? So you're going to have to remove $1.5 million in revolving credit and $4 million in real estate loans.

So what did we do as part of this transaction? We moved the whole $1.5 million of the revolving loan, right, and entered into a forbearance agreement so they wouldn't have to pay on it, right?

And then, secondly, we unbuckled the primary real estate loan, which was against the assets, and got DCR to agree to remove their UCC filings against the assets of the law firm.

Now the law firm is free to go and borrow money against their accounts receivable so that they can not only continue to operate but to expand.

And the thing to understand is that a foreclosure law firm has to front up half of all of its costs, right? So if they sent out a bill for $100 to the Bank of America for a foreclosure, 50 percent of that, more or less, is for out-of-pocket costs that they advance for notice and publication and all that kind of other stuff.

So a foreclosure firm has to have capital, and they did not have access to capital until we did this transaction for them.

(App Ex. 3, p. 133, line 22 – p. 135, line 22)

Following the Debtor's conversion of its secured guaranty of the SAA Obligations to an unsecured guaranty and Maasai's acquisition of the DCR Note, the Debtor engaged in receivables financing with Durham. (App Ex. 3, p. 133, line 22 – p. 137, line 14)

2. Value of Consideration

The consideration received – or benefit obtained - by the Debtor in exchange for the Transfers consisting of access to capital, including removing obstacles to engaging in a receivables factoring arrangement with Durham, was, according to the Plaintiff's expert, neither fair nor reasonably equivalent in value to the property transferred to Durham through the Transfers. (App Ex. 16)  The Plaintiff's Expert, Richard A. Clarke, a former senior bank officer with over 40 years of experience in banking and workouts with financially troubled businesses, and a lecturer "throughout the nation on all phases of deposit operations and commercial lending," opined as to the consideration the Debtor received in exchange for the transfers.  He stated:

> To determine what the Debtor received in exchange for the Transfers, I examined the changes to the Debtor's financial position and debtor-creditor relationships before and after the Transfers resulting from the execution and delivery of the February 7, 2013 transactional documents. There were two noteworthy changes. First, the Debtor's guaranty of SSA's [sic] mortgage obligations was converted from a secured guaranty to an unsecured guaranty. Second, Durham's affiliate, Maasai, now held the DCR Note which was secured by the Debtor's accounts receivable and other assets. This enabled the Debtor to factor its receivables free of DCR's liens. While the factored receivables appear to have remained subject to the liens of ServiceLink, the prior security interest of DCR that was assigned to Maasai to secure the DCR Note impaired any effective effort by ServiceLink to exercise its secured party rights. Thus, ServiceLink was effectively blocked from intervening to thwart the factoring of receivables to Durham.

> Thus, the entire arrangement as reflected in the various transactional documents executed as of February 7, 2013 effectively enabled the Debtor to proceed with a factoring arrangement with Durham. It is my opinion that this was the primary, if not sole, benefit to the Debtor in making the Transfers to Durham.

> While the Debtor received a benefit in having this arrangement, the benefit was merely the ability to factor receivables to Durham pursuant to the

23

Factoring Agreement.  The value of factoring receivables to Durham is fully set forth in and determined by reference to the Factoring Agreement itself. Under the Factoring Agreement, the Debtor was required to pay Durham an origination fee of 1% of the $1,200 [sic] credit limit, or $12,000. In addition, the Debtor was required to pay Durham an upfront fee of 3.25% of the face value of each factored receivable, plus additional fees of 1.625% for each 15-day period that an account was delinquent by more than 30 days. Based on a 30-day turnaround for receivables, the Debtor was paying Durham an effective annual rate of at least 39% (3.25% x 12 months). If the receivable is paid six months late, the Debtor is required to pay Durham an additional 19.5% fee (12 15-day periods times 1.625% per period). Thus, depending on the turnaround time of receivables that are factored to Durham, the Debtor could be charged a finance fee well in excess of the interest rate equivalent of 50%. Durham reserved and withheld 35% of the face amount of the receivable to satisfy the Debtor's fee obligations. Thus, the Factoring Agreement contains the pricing structure and therefore the consideration payable to Durham for each factored receivable. Indeed, the fees set forth in the Factoring Agreement are so excessive as to demonstrate that Durham was acting as a lender of last resort.

Accordingly, the Debtor received no consideration of any monetary value in exchange for the Transfers.

Clark also opined on the issue of whether the Debtor received reasonably equivalent value in exchange for the Transfers.  He stated the following in his report:

It is my opinion that the Debtor did not receive reasonably equivalent in exchange for the Transfers. For the reasons stated above, all the Debtor received in exchange for the Transfers was an opportunity to factor receivables to Durham. The cost to the Debtor for Factoring Receivables is set forth in the factoring agreement itself. As explained above, the Debtor paid an origination fee in exchange for the credit facility and further fees in exchange for each factored receivable. The fees set out in the Factoring Agreement alone establish the consideration which the Debtor and Durham agreed would be paid for the Debtor's invoices.

Defendants did not quantify evidence that the consideration for the Transfers was reasonably equivalent in value to the property transferred to Durham on account of the Transfers.

24

F. <u>Solvency</u>

During the time period of the Transfers, specifically, January 1, 2013 through February 2013, the Debtor was insolvent. (App Ex. 17)  Craig R. Jalbert, a principal in the firm of Verdolino & Lowey, P.C. and a Certified Insolvency and Restructuring Advisor and Fellow of the American College of Bankruptcy, who has been employed in thousands of bankruptcy cases, opined:

> Having thoroughly reviewed the CGAW [the Debtor's] records made available to us, we have concluded that CGAW was, without a doubt, insolvent on October 16, 2012, and remained insolvent on each of the Test Dates [i.e., December 31, 2012, February 7, 2013, February 26, 2013, and March 31, 2013] and throughout the Review Period, and in our opinion, absolutely nothing positive took place in the intervening months that could possibly have made CGAW solvent at any time after the Test Dates, and up until the involuntary bankruptcy petition on September 3, 2014.

G. <u>Maasai's Benefit from the Transfers</u>

Maasai acquired the DCR Note using funds provided by Durham. (App Ex. 3, p.107, lines 6-15; App Ex. 13)  Durham was willing to provide and provided the $963,989.82 in funds to Maasai to acquire the DCR Note only after the Debtor, through its principal, Scofield, signed the funding documents. (App Ex. 3, p. 107, lines 6-15; App Ex. 13; App Ex. 12, Trustee_00001) The funding documents included (i) all of the documents by which the Factored Invoices were sold and assigned to Durham; (ii) a complete accounting of the $198,100.33 in collections of the Unfactored Invoices; (iii) an accounting of the $200,000 in cash transferred to Durham on February 7, 2013; and (iv) a statement prepared by Durham and signed by Scofield under the heading "Approved and

Accepted" showing the uses of all such funds, including specifically the amounts necessary to acquire the DCR Note. (Id.)

Upon acquisition of the DCR Note on February 7, 2013, Maasai required the Debtor to execute an Estoppel Certificate reaffirming the Debtor's obligations under the DCR Note, acknowledging that Maasai has the right to enforce the DCR Note and confirming the amount due under the DCR Note to Maasai was $1,493,612.61. (App Ex. 18) By letter agreement dated February 7, 2013, Maasai appointed Durham to act as its servicer, accounts receivable processor and nominee for purposes of notifying account debtors of the assignment of receivables to Durham and the collection of such receivables directly from account debtors, including the right to bring actions on behalf of Maasai in the name of Durham. (App Ex. 19)

Maasai continues to hold the DCR Note and continues to assert that it has all of the rights in and to such Note as if were assigned to it by DCR, including a first priority security interest in and to substantially all of the assets of the Debtor. (*See* Adversary Proceeding Docket No. 77, pp. 2-3 (Maasai asserting that it holds a valid, properly perfected and enforceable senior pre-petition lien); Main Case Docket No. 346, ¶¶ 4-11 (asserting that Maasai holds a properly perfected senior security interest in all assets pursuant to the DCR Note and Security Agreement securing a claim of $3,006,493.72)).

According to the Defendants, however,

> After the purchase of the DCR Loan, the Law Firm removed the entire DCR Loan from its balance sheet based on the discounted price for Maasai's purchase of the DCR Note, and the corresponding cash collateral held by Durham to offset the remaining $700,000.00 left on the note, which left the Law Firm with no immediate obligation to pay principal or interest on the

loan because of the Forbearance Agreement.  As the Trustee's experts acknowledge, the Law Firm also booked the $662,822.21 discount as "settlement income" in 2013.[12]

The figure of $662,822.21 appeared as a credit in a "Transaction Journal," which the Defendants attached to their Opposition.  The sum was described, without explanation by the individual responsible for the preparation or the Transaction Journal, as "settlement DCR-LOC write down" with a reference to "Line of Credit-DCR."  Jalbert referenced the sum of $662,822.21 in his report, stating: "The largest change in [the Law Firm's balance sheet] numbers between December 31, 2012 and February 7, 2013 of $840,792.68 is for the most part the result of the booking of a payoff of a liability and recording of Settlement Income on February 7, 2013 of $662,822.21 related to the DCR Note Acquisition."  In view of 1) the Estoppel Certificate pursuant to which the Debtor acknowledged that the amount due and outstanding under the Loan Documents was $1,493,612.61, and 2) Jalbert's subsequent statement, "as we have noted previously, the Debtor never received any consideration in connection with the purchase of the [DCR] Note, nor was the note paid off according to Durham," the so-called "write down" of $662,882.21 is inexplicable and does not establish fair consideration or reasonably equivalent value as the Defendants contend.

---

[12] The Defendants referenced the Law Firm's contemporaneous Quick Books records as well as Jalbert's Report at p. 8.

## IV. DISCUSSION

A. <u>Summary Judgment Standard</u>

According to the United States Bankruptcy Appellate Panel of the First Circuit in

<u>Raso v. Fahey (In re Fahey)</u>, 482 B.R. 678 (B.A.P. 1st Cir. 2012),

> "In bankruptcy, summary judgment is governed in the first instance by
> Bankruptcy Rule 7056." <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760,
> 762 (1st Cir. 1994); *see also* <u>Soto–Rios v. Banco Popular de Puerto Rico</u>, 662
> F.3d 112, 115 (1st Cir. 2011). "By its express terms, the rule incorporates into
> bankruptcy practice the standards of Rule 56 of the Federal Rules of Civil
> Procedure." <u>In re Varrasso</u>, 37 F.3d at 762 (citations omitted); *see also* <u>Soto–
> Rios v. Banco Popular de Puerto Rico</u>, 662 F.3d at 115; Fed. R. Bankr. P. 7056;
> Fed. R. Civ. P. 56.6 "It is apodictic that summary judgment should be
> bestowed only when no genuine issue of material fact exists and the movant
> has successfully demonstrated an entitlement to judgment as a matter of
> law." <u>In re Varrasso</u>, 37 F.3d at 763 (citing Fed. R. Civ. P. 56(c)). "As to issues
> on which the nonmovant has the burden of proof, the movant need do no
> more than aver an absence of evidence to support the nonmoving party's
> case." <u>Id.</u> at 763, n.1 (citation and internal quotations omitted). "The burden
> of production then shifts to the nonmovant, who, to avoid summary
> judgment, must establish the existence of at least one question of fact that
> is both genuine and material." <u>Id.</u> (citations and internal quotations
> omitted). The "mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106
> S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

<u>In re Fahey</u>, 482 B.R. at 686–87. *See also* <u>Cruickshank v. George R. Roberts Co. (In re Boston</u>

<u>Grand Prix, LLC)</u>, No. 16-12574, Adv. P. No. 17-1115, 2018 WL 4030731 (Bankr. D. Mass.

Aug. 21, 2018); <u>In re Spenlinhauer</u>, 572 B.R. 18, 32–33 (Bankr. D. Mass. 2017).

B. <u>Applicable Law</u>

Section 548 of the Bankruptcy Code provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for
the benefit of an insider under an employment contract) of an interest of the

debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily- . . .

> (B)(i) received less than *a reasonably equivalent value* in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

11 U.S.C. § S.C. 548 (emphasis supplied).

Section 5 Mass. Gen. Law ch. 109A, made applicable to this proceeding by 11

U.S.C. § 544(b), provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . .
>
>> (2) without receiving *a reasonably equivalent value* in exchange for the transfer or obligation, and the debtor:
>>
>>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Mass. Gen. Laws ch. 109A, § 5. Section 6, in turn, provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the

transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws ch. 109A, § 6.

The Bankruptcy Code and the UFTA are not dissimilar.  According to the court in

Tomsic v. Pitocchelli (In re Tri-Star Techs. Co., Inc.), 260 B.R. 319 (Bankr. D. Mass. 2001),

> In many respects, the Massachusetts UFTA § 6(a) mirrors Bankruptcy Code § 548(a)(1)(B). Campana v. Pilavis (In re Pilavis), 233 B.R. 1, 10 (Bankr. D. Mass. 1999); Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.), 139 F.3d 574, 577 (7th Cir. 1998). However, critical differences exist. For avoidance of the challenged payments pursuant to UFTA § 6(a), the Trustee's derivative standing under § 544(b) is dependent on the existence of at least one actual unsecured creditor who could have avoided the challenged transfers. Section 548(a)(1)(B) does not require the existence of such a creditor. Furthermore, avoidance actions under § 6(a) of UFTA must be brought within four (4) years from the date of the transfers. Carpenter v. Granderson (In re Granderson), 214 B.R. 671, 672 (Bankr. D. Mass. 1997); Mass. Gen. Laws Ann. ch. 109A, § 10. Section 548(a)(1)(B), on the other hand, reaches back only to those transfers made within one year of case commencement.

In re Tri-Star Techs. Co., Inc., 260 B.R. at 324.[13]

With respect to what constitutes "reasonably equivalent value," this Court in Agin

v. Grasso (In re Luciani), 584 B.R. 449 (Bankr. D. Mass. 2018), stated the following:

> The analysis of what constitutes "reasonably equivalent value" under the relevant sections of the Massachusetts UFTA mirrors the analysis of "reasonably equivalent value" under 11 U.S.C. § 548, *see* [Tomsic v. Pitocchelli (In re) ] Tri–Star [Techs. Co., Inc.], 260 B.R. [319] at 324 [(Bankr. D. Mass. 2001)]; Riley v. Countrywide Home Loans Inc. et al. (In re Duplication Mgmt., Inc.), 501 B.R. 462, 481–84 (Bankr. D. Mass. 2013), which has been described as follows:
>
> > [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what

---

[13] The reach back period under § 548(a)(1) is now two years.

> was given with what was received." And, in making this
> determination, both direct and indirect benefits should be
> considered. It is not necessary that there be an exact exchange
> in order to establish reasonably equivalent value, but the
> Court "must keep the equitable purposes of the statute firmly
> in mind, recognizing that any significant disparity between
> the value received and the obligation assumed . . . will have
> significantly harmed . . . innocent creditors.

In re Luciani, 584 B.R. at 455–56 (citing In re Comprehensive Power, Inc., 578 B.R. at 33,

and Tri–Star, 260 B.R. at 325–26 (internal citations omitted)).

    C. Arguments of the Parties

       1. The Plaintiff

The Plaintiff contends that there is no genuine dispute that as of February 7, 2013,

the Debtor had transferred directly to Durham $1,024,799.48 in cash or property.

Moreover, the Plaintiff contends that the consideration identified by the Defendants that

the Debtor received in exchange for such transfers was access to capital in the form of an

opportunity to sell to Durham future invoices which would allow the Debtor to continue

operating for a limited period of time.  The Plaintiff also contends that there is no genuine

dispute that the transfers enabled Maasai to acquire the fully secured $1.5 million DCR

Note and the acquisition of the DCR Note was made possible by the transfer from

Durham to Maasai on February 7, 2013 of $963,989.82, the precisely calculable portion of

the $1,024,799.48 in transfers allocated to acquisition of the DCR Note according to

Durham's own contemporaneous calculations and settlement statement.

The Plaintiff emphasizes the Defendants failed to produce evidence to rebut the

Trustee's forensic analysis, based on the records of Durham and the Debtor, which

conclusively establishes that $626,699.15 was never advanced following the sale or

receivables in the amount of $951,719.81 to Durham.  Thus, the Plaintiff contends that the

subject transfers are avoidable under Counts I and II of the Complaint because they were

made without fair consideration or reasonably equivalent value while the Debtor was

insolvent.   In addition, the Plaintiff argues that he is entitled to judgment on Count III

against Maasai, arguing as follows:

> Maasai was the entity for whose benefit the transfers occurred. Maasai was
> the beneficiary of the transfers because Durham paid Maasai money to
> acquire the DCR Note in the exact amount allocated for such purpose
> according to Durham's own settlement statement as to the sources and uses
> of the $1,024,799.48, and only after the Debtor's principal, Lawrence
> Scofield, had signed the documents transferring ownership of the invoices
> to Durham and expressly authorizing the funds to be used to acquire the
> DCR Note. Moreover, according to Durham's own agreements, the intent
> of Durham and Maasai was for Durham to act merely as the receivables
> processing agent for Maasai, making Maasai the principal. Thus, Maasai
> was the entity for whose benefit such transfers were made.

The Plaintiff observes that there is an absence of consensus as to whether the benefit

required under § 550(a) must be actual or intended, citing, inter alia, Terry v. Meredith

(In re Meredith), 527 F.3d 372, 376-77 (4th Cir. 2008) (actual benefit required), Freeland v.

Enodis Corp., 540 F.3d 721, 740 (7th Cir. 2008) (actual benefit required), and Danning v.

Miller (In re Bullion Reserve of N. Am.), 922 F.2d 544, 547-48 (9th Cir. 1991) (intent to

benefit required).  He argues, however, that under the circumstances present in this case,

the benefit was both intended and actual.  He states:

> It is intended because the funding documents were executed under the
> terms of an express email that doing so would enable Maasai to acquire the
> DCR Note. It is actual because Maasai did in fact acquire the DCR Note as
> a direct consequence of the Debtor's signing the funding documents
> confirming the sources and uses of the $1,024,799.48 in transfers.

2. The Defendants

The Defendants make several arguments in support of their position that the Trustee is not entitled to summary judgment.  They maintain 1) that the Trustee has not marshalled sufficient facts to support fraudulent transfer claims against Durham or Maasai because, among other things, the Trustee continues to ignore the direct value received by the Debtor as a result of the transactions between and among the Debtor, Durham, and Maasai under both the Factoring Agreement and in connection with the purchase of the DCR Note; 2) that the Plaintiff ignores the fact that the Factoring Agreement between Durham and the Law Firm expressly granted Durham a security interest in all of the Law Firm's accounts receivable and their proceeds and therefore any transfer of accounts receivable from the Law Firm to Durham after the Factoring Agreement was executed in November 2012 became Durham's collateral; and 3) that the Plaintiff has not demonstrated that the Debtor was insolvent at the time of the Transfers or was rendered insolvent by the Transfers, adding that "at a minimum, solvency is an issue that should be determined at trial."  They also contend that the Plaintiff's experts "seem to disagree about the facts of the case and the value received by the debtor in connection with the Transfers."

The Defendants maintain that

The record is devoid of any facts that support the Trustee's bald allegations that the transactions in late 2012 and early 2013 were anything other than an agreement to allow Durham to factor the Law Firm's accounts receivable that provide [sic] significant value to the Law Firm that was predicated on a Law Firm -sanctioned purchase at a substantial discount of an existing debt that left the Law Firm in a more-favorable position than it occupied

33

immediately preceding Durham and the Law Firm's entry into the Factoring Agreement and Maasai's purchase of the DCR debt. Accordingly, the Trustee is not entitled to Summary Judgment.

The Defendants contend that Bley's focus on the sum of $626,699.15, which was not remitted to the Debtor in connection with the transfer of $951,719.81 in receivables, "ignores the fundamental fact that Durham held the receivables as collateral consistent with its security interest under the Factoring Agreement and Maasai's security interest under the DCR Loan documents." They also maintain that Clark's conclusion that the Debtor was not relieved of any liabilities that would have improved its balance sheet is inconsistent with Jalbert's observation that the largest change in the Debtor's balance sheet resulted from the booking of a payoff of a liability and the recording of income of $662,822.21 relating to "settlement DCR-LOC write down." In its view, the discrepancies relating to the Debtor's balance sheet creates a genuine issue of material fact.

The Defendants also argue that there were no transfers of any interests from the Debtor to Durham and/or Maasai. The Defendants maintain that because of the security interest granted by the Debtor under the Factoring Agreement that predated the transfers to secure repayment, all of the transfers alleged by the Trustee were Durham's collateral. It adds that, of the $963,989.00 transferred to Durham, $263,989.00 were paid directly to third parties to pay taxes, utilities, legal fees and other related closing costs as direct pass through payments requested by the Debtor, thus enabling the Debtor to receive "dollar-for-dollar value for the $263,989 in closing costs," the net value of which after those payments was $700,000.00. The Defendants also argue that "Maasai was able to negotiate with DCR to reach a purchase price of $700,000 . . . [and] . . . Maasai did not receive any

34

property belonging to the Law Firm and received no benefit actual or intended." It adds:

"Durham, after taking the receivables from the Law Firm, then funded Maasai's purchase

of the DCR Note. There were no avoidable transfers from the Law Firm to Durham. And

there were no transfers of any kind from the Law Firm to Maasai." The Defendants

reason:

> While Maasai has maintained its right pursuant to the Loan Purchase
> Agreement to enforce the full face value of the DCR Note in the event of
> default—for example as against the Law Firm's estate in bankruptcy—it
> never enforced those rights prepetition. Maasai did not want to act to apply
> funds available against the Law Firm's obligation on the DCR Note because
> doing so would have closed out the note and ceded Maasai's first lien
> position on the Law Firm's assets.
>
> The Law Firm booked the discounted purchase price and accounted for
> $662,822.21 in settlement income from the purchase.

The Defendants also challenge the Plaintiff's evidence relating to the absence of

quantifiable reasonably equivalent value. They maintain that the Debtor received

"dollar-for-dollar value for the $263,989 in closing costs," as well as the removal of the

DCR obligations from the Debtor's balance sheet "based on the discount of $662,822 and

corresponding cash collateral to offset the remaining $700,000.00 left on the DCR Note

with no payments of principal or interest due or owing during the two-year forbearance

period." In other words, they maintain that the Debtor received "direct, equivalent

value" when it transferred $963,989.00 to Durham and when $263,989.00 was paid to

third parties "as direct pass through payments requested by the Law Firm."[14] According

---

[14] The Defendants submitted no evidence that the Debtor requested that these payments
be made.

35

to the Defendants, the Debtor removed the entire $1,362,822.21 DCR Loan from its balance sheet after the DCR Loan was purchased by Maasai for the discounted price of $662,822, and "corresponding cash collateral to offset the remaining $700,000.00 left on the DCR Note with no payments of principal or interest due or owing during the two-year forbearance period." Thus, they claim that, even if the $700,000.00 is viewed as a transfer, the Debtor received reasonably equivalent value of $662,822.00. The Defendants also maintain that the Debtor received consideration in the form of the release from the cross-collateralization of the obligations guaranteed by the Debtor, the release of the SAA mortgage, the release of the Environmental Indemnity obligation and "DCR's forbearance from exercising rights it held under the loan documents guaranteed by the Law Firm that were not sold to Maasai." The Defendants also point to Durham's subsequent advances through June of 2014 which they contend represent a $4.5 million benefit to the Debtor. In sum, they assert that the Debtor removed a significant liability from its balance sheet and gained access to capital by virtue of the transaction.

With respect to the issue of insolvency, the Defendants point to a representation of solvency in §3.1 of the Factoring Agreement and a representation that the Forbearance Agreement in which the parties represented that the agreement was not made with actual intent to hinder, delay, or defraud any entity or person, as well as an email from Robert Feige, an employee of the Debtor, to an individual at Durham in which he stated "Our profit on full accrual GAAP is going to be about $3M." In addition, the Defendants assert that the removal of the immediate consequences of a $1.5 million defaulted loan gave the

Debtor a two year respite from any interest or principal payments and increased the

Debtor's cash flow. They add that a genuine issue of fact exists because:

> The Law Firm's insolvency and decline into bankruptcy was not the result
> of the loan purchase; quite the opposite. Those transactions provided the
> Law Firm with a platform from which it could have and should have
> survived. Theft of clients [sic] trust funds, negligent management, highly
> suspect business practices by the Law Firm's principals and declining
> market conditions caused the Law Firm's financial demise.[15]

Finally, the Defendants assert that to the extent the Plaintiff relies upon the claims

held by ServiceLink to stand as a claim of an unsecured creditor for the purposes of

avoidance under the UFTA, the Trustee must concede that ServiceLink was a secured

creditor of the Law Firm at the time of the transfers.

### 3. The Plaintiff's Reply

The Plaintiff cogently rejects each and every argument made by the Defendants,

emphasizing that the Defendants did not dispute the qualifications of his experts or the

admissibility of their reports, as well as their failure to submit any expert reports of their

own in rebuttal with respect to reasonably equivalent value and insolvency.  The Plaintiff

adds that the Defendants also did not adequately dispute that Maasai was the entity for

whom the transfers were made.  The Plaintiff observes:

> The sole "evidentiary" material on which Defendants rely in their
> Opposition is a single affidavit from Craig McGrain . . . ("McGrain
> Affidavit"). The McGrain Affidavit restates numerous facts not in dispute,
> characterizes legal documents, offers inadmissible opinions on material
> matters, contradicts Durham's own written documentation, makes
> conclusory statements, indulges in argument, and generally fails to support
> specific factual statements with evidence.

---

[15] The Defendants submitted no evidence to support this argument.

The Plaintiff argues that he established through the summary judgment record that the Debtor did not receive reasonable equivalent value for the transfers. He maintains that the Defendants' criticism that his expert reports are contradictory is "grossly misleading." In particular, the Plaintiff states that the Defendants omitted Jalbert's disavowal of the improvement of the Debtor's balance sheet owing to the "settlement income" of $662,822.21. The Plaintiff observes that Jalbert opined that despite the so-called settlement income, "as we have noted previously, the Debtor never received any consideration in connection with the purchase of the [DCR] Note, nor was the note paid off according to Durham." The Plaintiff also emphasizes that there was no debt relief in connection with the acquisition of the DCR Note as the Law Firm expressly acknowledged that the balance due under the DCR Note was $1,493,612.61 and that "neither the [Debtor] nor Ablitt had any defenses against enforcement of the loan by Maasai." Thus, the Plaintiff concludes: "If the Debtor booked any debt relief in connection with the transaction, such booking, even if admissible evidence, is immaterial because both the Trustee and Defendants agree that there was no reduction in the DCR Note loan balance."

With respect to the Defendants' assertion that the Debtor's "balance sheet" improved by $662,822 based on the Debtor's records, the Plaintiff further argues:

> That is at best hearsay and certainly not admissible evidence of the true balance sheet. Most importantly . . . since Defendants and the Trustee both agree that there was no debt relief in connection with the DCR Note (e.g., Opposition, p. 6 (characterizing Estoppel Certificate)), it is not open to Defendants to simultaneously argue that there was $662,822 in debt relief based on what all parties agree was an obviously erroneous and nonsensical book entry.

To the extent the Defendants argued there were no transfers of any interest of the Debtor because Durham had a security interest in all assets transferred, the Plaintiff counters, recognizing the following:

> There is a difference between a transfer for collateral purposes and a transfer for ownership purposes. Here, the Debtor transferred actual ownership of the property. That is clear from the language of the assignment of invoices and from the fact that Durham kept the property and used it to buy the DCR Note, rather than holding it and later applying it to reduce the amount owed it by the Debtor. . . . [T]here is no evidence, admissible or otherwise, that the property transferred was to be held by Durham or Maasai as collateral.

The Plaintiff also argues that the Defendants are barred from raising a new theory of consideration in addition to their "access to capital" theory. Nevertheless, the Plaintiff addresses the additional consideration referenced by the Defendants in their Opposition. In particular, the Plaintiff asserts that there is no evidence that the payments totaling $263,989.00, which was used to pay real estate taxes, utilities and other closing costs, relieved the Debtor of any liabilities because it did not own the Property and the closing costs merely enabled the transaction to occur. In addition, the Plaintiff argues that relief from existing cross-collateralization provisions does not constitute additional consideration because it was "a component of or means to the ultimate consideration of access to capital through the Factoring Agreement with Durham" and because the conversion of a secured guaranty to an unsecured guaranty enabled the Debtor to factor its receivables to Durham. The Plaintiff emphasizes that conversion of a liability from secured to unsecured does not result in debt relief or improvement of the balance sheet.

With respect to the contingent Environmental Indemnity, the Plaintiff notes that there was no evidence as to its value, let alone value in the sum of $1,024,799.48, and thus release of potential Environmental Indemnity liability cannot serve as quantifiable consideration.

The Plaintiff makes several other arguments.  In particular, the Plaintiff maintains that the Defendant did not demonstrate the existence of a genuine issue of material fact on the issue of solvency; that Maasai was the intended beneficiary of the transfer; or that ServiceLink was not a creditor for purposes of § 544.[16] Regardless of whether ServiceLink is a creditor for purposes of § 544(b), the Plaintiff recognizes that he can avoid the transfers under § 548.

The Plaintiff further maintains that nothing in the McGrain Affidavit creates a genuine issue of material fact, particularly where McGrain was merely a fact witness, and any opinion he proffered as to the value received by the Debtor is inadmissible.   To the extent McGrain asserted that the receivables were transferred as collateral, the Plaintiff asserts that such averments are conclusory and contradict the documents executed at the time of the transfers.  Stated another way, the Plaintiff asserts that there is nothing in the

---

[16] The Plaintiff states:

> Prior to the transaction, DCR held a security interest in the Debtor's accounts securing claims in excess of $5.5 million (both the guaranty claim and DCR Note claim). At that time, there can be no dispute that ServiceLink was wholly unsecured because it was junior to DCR. Following the transaction, Maasai held the DCR Note secured by all assets of the Debtor. Moreover, as of the Petition Date, ServiceLink's claim was wholly unsecured. Accordingly, ServiceLink could have avoided the transfers under applicable non-bankruptcy law.

documents that establishes that the receivables were to be conveyed to Maasai to be held

as collateral for the DCR Note, especially where the receivables were sold and assigned

to Durham on February 7, 2013 pursuant to the Factoring Agreement and Account

Purchase Addenda.  In addition, the Plaintiff contends that there was no evidence that

Durham ever exercised its rights with respect to the factored invoices as a secured

creditor pursuant to the UCC.  Thus, the Plaintiff concludes:

> The transfers were quantified, accounted for and characterized in
> voluminous documents all executed as of February 7, 2013. Defendants are
> unable to cite a single contemporaneous document characterizing the
> February 7, 2013 transfers as anything other than absolute conveyances as
> the documents themselves say they are. The very idea that the transfers
> were made for collateral purposes to secure the DCR Note being sold to
> Maasai and never became Durham's property is a wholly unsupported
> conclusory averment put forth only now in the face of unconvertible [sic]
> evidence that the transfers were in fact made and that the purchase price
> was never remitted to the Debtor.

D. <u>Analysis</u>

Based upon the foregoing evidence and arguments, the Court concludes that the

Plaintiff is entitled to summary judgment as the Defendants failed to raise any genuine

issues of material fact incident to the Counts set forth in the Plaintiff's Complaint which

are now before the Court.  The Plaintiff has shown that he is entitled to judgment as a

matter of law.  In sum, the Plaintiff established the elements for avoidance of fraudulent

transfers.  He established that while the Debtor was insolvent, it transferred sums in the

amounts of $198,100.22, $200,000.00, and $951,719.81 to Durham, that Durham failed to

remit the sum of $626,699.15, and that the Debtor did not receive reasonably equivalent

value in exchange for those transfers.  Furthermore, the Plaintiff established that Durham

provided funds to Maasai to acquire the DCR Note and thus established entitlement to

recovery against the Defendants pursuant to 11 U.S.C. § 550(a)(1).  The Court agrees with

the Plaintiff that the benefit to Maasai was both actual and intended because the funding

documents were executed under the terms of an email from Tim Mura at Durham to

Robert Feige, the Chief Operating Officer of the Law Firm (App Ex. 12) that enabled

Maasai to acquire the DCR Note and because Maasai did acquire the DCR Note as a result

of the Law Firm's execution of the funding documents that confirmed the sources and

uses of the transfers.   The Plaintiff submitted evidence of a benefit to Maasai that was

"direct, ascertainable, and quantifiable." *See* <u>Gowan v. Amaranth LLC (In re Dreier)</u>, 452

B.R. 451, 466 (Bankr. S.D.N.Y. 2011) ("In order to establish liability for a transferee for

whose benefit the transfer was made, "[t]he benefit must be 'direct, ascertainable and

quantifiable' and must correspond to, or be commensurate with, the value of the property

that was transferred.").  *See also* <u>Geltzer v. Salzman (In re Continuityx, Inc.)</u>, 582 B.R. 124,

137 (Bankr. S.D.N.Y. 2018) (A party is liable as one for whose benefit the transfer was

made, if the debtor intended that the transfer benefit the party from whom recovery is

sought, and that benefit originated from the initial transfer); <u>Spradlin v. Pryor Cashman</u>

<u>LLP (In re Licking River Mining, LLC)</u>, 565 B.R. 794, 806 (Bankr. E.D. Ky. 2017) ("To

recover an avoided transfer from a party as 'the entity for whose benefit such transfer

was made,' a trustee must establish that the debtor intended to benefit that party by

making the transfer, and also that the party actually received a benefit from the

transfer."). The Defendants did not contend otherwise, relying upon a conclusory

statement that "Maasai did not receive any property belonging to the Law Firm and

received no benefit actual or intended" - - notably, a statement at odds with the statements of Defendants' counsel at the hearing on January 9, 2019.

The Court also agrees with the Plaintiff that the Defendants' Opposition fails to state any facts supported by admissible evidence precluding summary judgment, although the Opposition does contain numerous arguments that do not withstand scrutiny. Because the Defendants failed to comply with MLBR 7056-1, the Plaintiff's material facts are unrebutted and deemed admitted. For example, the Defendants' unconvincingly and improperly rely upon a Transaction Journal entry, "settlement DCR-LOC write down," and a email statement by Robert Feige, whom they did not identify in their Opposition, that the Debtor's profit was going to be about $3M, in an attempt to counter the thorough analysis of the Debtor's balance sheets prepared by the Plaintiff's expert Jalbert who concluded that "without a doubt," the Debtor was insolvent on October 16, 2012 and thereafter.

The Defendants did not raise issues of material fact with respect to the existence of reasonably equivalent value supporting the transfers as the quantification of value they proffered fell far short of reasonableness. The Defendants' arguments that transfers of property of the Debtor did not occur because they constituted collateral cannot be reconciled with the Factoring Agreement and the Forbearance Agreement.  In the absence of any existing default under the Loan Documents, the security interests in the accounts receivable were not transmuted to outright ownership, and, thus, it was incumbent upon the Defendants to establish entitlement to retention of $1,024 799.48.  The Defendants failed to do this in any coherent manner.

The Defendants failed to set forth a cogent accounting to rebut the Plaintiff's factual recitation as to the transfers made by the Debtor to Durham. The Defendants did not calculate, or even attempt to calculate, the amount Durham would have been entitled to withhold from the unfactored accounts receivable, i.e., $198,100.33, and the factored receivables, i.e., $951,719.81. Under the Factoring Agreement, Durham was entitled to payment of a fee of 3.25% of the original face amount of each account receivable purchased and the retention of a reserve amount equal to 35% of the face amount of each purchased account, as well as a 1% origination fee. Those calculations should have been and could have been performed to enable this Court to determine with certainty what sums Durham properly retained and whether they were authorized under the Factoring Agreement. The burden shifted to the Defendants to rebut the Plaintiff's undisputed material facts. They failed to satisfy that burden by failing to analyze respective rights under the Factoring Agreement, arguing instead that because the Debtor's accounts receivable were Durham's collateral it could retain them even though the Defendants did not point to any default under the Loan Documents until well after the February 7, 2013 transactions. Thus, because the Debtor was not in default under the Loan Documents, including the Forbearance Agreement, when it made the transfers before and on February 7, 2013, the Defendants' argument that Durham was entitled to retain receivables as collateral does not withstand scrutiny. The argument ignores the essential nature of the Factoring Agreement, namely that it was a sale of receivables which entitled Durham to retain certain sums pursuant to a formula, and to remit the balance of the receivables collected to the Debtor as capital enabling it to continue its business operations.

When the transactions are reduced to their essence, the sums transferred to Durham and Maasai enabled Maasai to acquire the DCR Note with the Debtor's own funds. Given this likely scenario, and the absence of any rationale for the so-called settlement write down of $662,822.21 in derogation of the Estoppel Certificate, it was incumbent upon the Defendants to point to specific facts in dispute and to proffer its own expert testimony and evidence to rebut the persuasive, indeed compelling opinions submitted by the Plaintiff in support of his Motion. It did not do so.

## V. CONCLUSION

In view of the forgoing, the Court shall enter an order granting the Plaintiff's Motion for Summary Judgment with respect to Counts I, II and III of his Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  February 27, 2019